## SULLIVAN et al. v. KRAUS et al.

(Supreme Court, Appellate Division, First Department. November 12, 1915.)

EXECUTORS AND ADMINISTRATORS ⊖⟳507—ACCOUNTING—REFEREE'S REPORT—EVIDENCE—SUFFICIENCY.

    The preliminary report of a referee, upon proceedings for an accounting by executors, that 500 shares of the capital stock of the City Theaters Company was partnership property and did not belong to the members of the partnership individually, *held* not supported by the evidence.

    [Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 2004, 2005, 2178–2191; Dec. Dig. ⊖⟳507.]

    Scott, J., dissenting.

Appeal from Special Term, New York County.

Action by Patrick H. Sullivan and another, as executors of Timothy D. Sullivan, deceased, against David Kraus and another, as executors of George J. Kraus, deceased, for an accounting of the affairs of the firm of Sullivan & Kraus, composed of Timothy D. Sullivan and George J. Kraus. A preliminary report of the referee was refused confirmation by the Special Term, and plaintiffs appeal. Affirmed.

See, also, 167 App. Div. 901, 151 N. Y. Supp. 1146.

The opinion of Shearn, J., at Special Term was as follows:

Pursuant to a stipulation there has been submitted for confirmation or rejection a preliminary report of a referee upon an accounting wherein the referee finds that 500 shares of the capital stock of the City Theaters Company, a domestic corporation, is partnership property of the firm of Sullivan & Kraus and should be accounted for as such. The copartnership of Sullivan & Kraus was formed by a written agreement on October 9, 1907, between Timothy D. Sullivan and George J. Kraus. The agreement provided that the members of the firm should be equal owners "of all property of every kind and nature formerly belonging to the firm of Sullivan & Kraus or to the Union Theaters Company," and that they "shall also be equally interested as such copartners in any other theatrical or other enterprise hereafter entered into by such firm of Sullivan & Kraus." In 1909 Timothy D. Sullivan, George J. Kraus, Timothy P. Sullivan, and William Fox organized the City Theaters Company, capitalized at $100,000. The claim of the plaintiffs, upheld by the referee, is that this was a theatrical enterprise entered into by the firm of Sullivan & Kraus, and therefore that the shares issued to Sullivan and to Kraus individually belonged to the partnership. The facts are practically undisputed and the legal question is merely the correct inference to be drawn from the undisputed facts.

When the City Theaters Company was organized, the two Sullivans, Kraus, and Fox each subscribed for $25,000 worth, par value of capital stock which was issued May 3, 1909, as follows: Timothy D. Sullivan, 250 shares, certificate No. 1; George J. Kraus, 250 shares, certificate No. 2; Timothy P. Sullivan, certificate No. 3, 250 shares; William Fox, 250 shares, certificate No. 4. When John Z. Lowe, Jr., Esq., was appointed receiver of the firm of Sullivan & Kraus on August 14, 1914, he took possession of the City Theaters Company's books, in which was found a memorandum, made by the firm's bookkeeper, Elliott, pursuant to the direction of Kraus at the time of the organization of the City Theaters Company, which reads as follows: "Stock is to be issued to Timothy P. Sullivan, G. J. Kraus, T. D. Sullivan, and William Fox; $25,000 is to be paid in by each one, 250 shares to be issued to each one, and, if they require more money, it is to be furnished by each one equally and credited to their personal account." The City Theaters Company's books have

a personal account for each one of these stockholders, and show that Timothy D. Sullivan, Kraus, Timothy P. Sullivan, and Fox each paid in to the City Theaters Company $32,625. Each therefore paid $7,625 in excess of the par value of the stock, the excess being considered as a loan to the company necessary in the course of construction; the entire excess, with the exception of $125 to each, having been subsequently repaid by the corporation. On May 24, 1909, less than a month after the stock was issued, Kraus surrendered his certificate, and had it split into certificates Nos. 5 and 6, for 125 shares each, issued to him individually.

On September 13, 1909, Kraus pledged with the Carnegie Trust Company these two certificates for a personal loan. When the trust company closed, Kraus was called upon to repay this loan, which had been reduced to $9,000. Kraus was embarrassed by the unexpected demand, and discussed the situation with Timothy D. Sullivan, who stated that he would help Kraus out, and they thereupon had two notes discounted, one of which Sullivan had discounted through his personal bank and the other Kraus had discounted; the proceeds being used on March 24, 1911, to pay the indebtedness of Kraus to the trust company. Subsequently these notes were taken up and paid; the $5,000 which Sullivan had obtained by discount at his bank being paid in December, 1912. When Sullivan offered to help Kraus with the notes, Kraus said to him: "So that there will be no trouble, I will have my stock and your stock transferred over in the name of George J. Kraus and Timothy D. Sullivan, so as to secure you until I pay off the $5,000. When that is done the stock is to be transferred back to the individual again."

On March 26, 1911, two days after the Carnegie loan was paid off, and pursuant to the arrangement made between Timothy D. Sullivan and Kraus, they surrendered their individual certificates in the City Theaters Company and obtained certificates Nos. 9 and 10, each for 250 shares, and each made out to "Timothy D. Sullivan and George J. Kraus." Whoever filled out these certificates was evidently accustomed to writing the firm name of Sullivan & Kraus, for certificate No. 9 was made out "Sullivan & Kraus," and then, the mistake having apparently been discovered, there was inserted "Timothy D." over Sullivan and "George J." over Kraus, so that "Sullivan & Kraus" appear on the line, while the first names of the members appear above. In certificate No. 10, prepared after certificate No. 9, the same mistake did not occur; the full names of Timothy D. Sullivan and George J. Kraus being written on the line. Timothy D. Sullivan became seriously ill in August or September, 1912, and his illness resulted in his afterwards being adjudged incompetent. As the $5,000 note which Sullivan had discounted for Kraus was not taken up until December, 1912, over three months after Sullivan's falling ill, the form of the certificates was never changed. Sullivan never recovered, and his death was followed by that of Kraus. Thereupon this action was brought, and the claim asserted that these two certificates, which under the circumstances above stated had been put into the names of "Timothy D. Sullivan and George J. Kraus," belonged to the partnership of Sullivan & Kraus, although there is nothing in the books of the firm of Sullivan & Kraus in evidence showing any ownership in or claim to the City Theaters Company's stock, and although in a statement of the firm's assets prepared by plaintiffs' accountant no mention was made of this stock.

The plaintiffs having the burden of sustaining their contention that the City Theaters Company stock constituted firm property, let us now examine the points advanced by the learned referee as sustaining this burden of proof:

(1) The partnership agreement is cited as "significant," wherein it provides for equal ownership of "any other theatrical or other enterprise hereafter entered into by such firm of Sullivan & Kraus." There is absolutely nothing in this from which partnership ownership of the City Theaters Company stock can be inferred. This agreement was made over two years before the corporation was formed. The meaning is clear. If the *firm* entered into any new venture, the partners' interest should be equal. Obviously that has no application to a situation where the individuals acquired individual rights in the capital stock of corporations engaged in any other enterprise. Sullivan's capital account in the firm of Sullivan & Kraus was considerably larger than

that of Kraus, and it became necessary to fix the interests of each partner in any new enterprise which the *firm* might undertake. To lay any stress upon this clause of the partnership agreement begs the whole question whether the firm or the individuals entered into the City Theaters Company enterprise.

(2) The referee rejects the inference that the change in the form of the stock certificates is consistent with individual ownership and was dictated by the desire of Kraus to secure Sullivan for his loan, saying "it is difficult to see how Sullivan obtained any additional security by such a transfer." Passing the rather obvious fact that, if it was intended by this change in the form of the certificates to vest title in the firm, the natural way to make out the certificates would have been "Sullivan & Kraus," and that one certificate would have sufficed, whereas two were used, each made out to "Timothy D. Sullivan and George J. Kraus," the referee ignores the fact that Sullivan was distinctly protected by this change in the form of the certificates, because it made it impossible for Kraus either to sell or hypothecate shares without the written consent of Sullivan.

(3) The referee lays great stress upon what is called the Hannah Sullivan loan. Hannah Sullivan is the widow of Timothy P. Sullivan. In December, 1910, Hannah Sullivan loaned $20,000 either to Timothy D. Sullivan and Kraus as individuals or to the firm of Sullivan & Kraus, and this sum was turned over to the City Theaters Company. The referee holds that Hannah Sullivan loaned this money to the firm, and that the firm used it to pay for the stock, and that consequently the stock belongs to the firm. This loan of $20,000 is charged on the books of the firm, not as a loan to the firm, but personally against each partner to the extent of $10,000, as though it were a loan of $10,000 to each of them. Elliott, the bookkeeper, testified that at first he had this entered as a loan to the firm, and on instructions from Kraus right after he had made the entry he changed it, charging each of the members with $10,000. The journal reads "George J. Kraus, $10,000; Timothy D. Sullivan, $10,000—loans from Hannah Sullivan." At this time Timothy D. Sullivan was at the office daily, and had access to and saw the books. The referee is therefore not justified in his statement that: "It appears from the book of Sullivan & Kraus that under date of January 31, 1910, Mrs. Hannah Sullivan loaned to the firm of Sullivan & Kraus the sum of $20,000."

(4) On February 10, 1912, a payment of $10,000 was made by the City Theaters Company to the four stockholders, $2,500 being paid to each individual. This was pursuant to a resolution "that the corporation at once repay the directors the sum of $2,500 each on account of moneys advanced to the corporation as a loan; the balance due on that date amounting to $7,625 to each director." Although this would seem to be persuasive evidence of individual ownership, and that the firm had not made loans to the corporation, the referee draws a contrary inference, based upon the statement that, while the stock then stood as it now stands, "the fact cannot be overlooked that the cashbook and ledger show that these payments were credited upon their personal or capital accounts in the firm books." The referee queries: "If these payments were to be considered distinctly individual or personal, the question naturally arises: Why were they entered upon the firm books at all?" This is a remarkable statement, because neither the cashbook nor the ledger of the firm of Sullivan & Kraus was introduced in evidence at all. However, if it were assumed to be a fact that the cashbook and ledger of the firm showed that these payments "were credited upon their personal or capital accounts," this would tend rather to corroborate the defendants' claim that the stock was individual property, because, if it were the firm property, there would be no occasion for crediting the members of the firm with this payment by the City Theaters Company, as it would be a payment to the firm, and not to the individuals. The referee asks why, as to this item, there was any entry in the firm books at all. There is no evidence that there was any such entry in the firm books; but, assuming that there were such entries, the bookkeeper, Elliott, plaintiffs' witness, testified that personal transactions of Kraus and personal transactions of Sullivan were entered in these books,

and that they went so far as to have their personal discounts upon their personal accounts in the firm books.

(5) On July 30, 1913, subsequent to the declared incompetency of Timothy D. Sullivan and a month prior to his death, at a meeting of the City Theaters Company a resolution was passed authorizing the repayment of $20,000 on account of moneys loaned to the corporation. According to the witness Fox, $10,000 of the sum was authorized to be paid at once to Sullivan & Kraus before payment was made to the other directors; Fox testifying that Kraus had informed him that the reason Sullivan & Kraus were desirous of getting their money first was to repay money due Hannah Sullivan. A $10,000 check to the order of Sullivan & Kraus was indorsed over to and collected by Hannah Sullivan. This $10,000 payment, when examined, tends to support the defendants' contention of ownership rather than that of the plaintiffs. The bookkeeper, Elliott, testified to the entries that he made in the books of Sullivan & Kraus with respect to that transaction as follows: "Mrs. Hannah Sullivan to George J. Kraus, $5,000; to Timothy D. Sullivan, $5,000; check from the City Theaters Company for $10,000 turned over to Hannah Sullivan to pay her note of July 31st." This indicates that Kraus and Sullivan had each been charged with half of the Hannah Sullivan loan. If this had been a firm transaction, there would have been no occasion for entering on the books a credit to each member of the firm. There was a practical reason for putting the check through the firm of Sullivan & Kraus. This payment was made July 31, 1913. Timothy D. Sullivan had been declared an incompetent. Kraus was not connected with his committee. When Sullivan became ill, the credit of the firm was cut down. Kraus had to meet payments of the firm and was tied up for money. Renewals of notes were refused. If this $10,000 payment by the City Theaters Company had been made by two checks, one of $5,000 to Kraus and one of $5,000 to Timothy D. Sullivan, the whole could not have been applied on Hannah Sullivan's note, but half of it would have gone to the committee of Timothy D. Sullivan. Hannah Sullivan was entitled to the money, and this short cut adopted was a perfectly natural one.

(6) The referee next lays stress upon a payment of $4,000 on February 6, 1914, 8 per cent. dividend on the stock of the City Theaters Company, made by check drawn to the order of Sullivan & Kraus, and deposited by Kraus in the firm account, and used to pay interest which was owed by the firm on the Gotham Theater property. Sullivan, it will be noted, was at that time dead. Plaintiffs' witness, Elliott, who made out this check, testified that he first made it out in the form of individual checks, one to Kraus for $2,000 and one to Sullivan for $2,000, and that Kraus thereupon directed him to make out one check for the firm. Money was pressingly needed for the purpose of paying interest on the Gotham Theater mortgage. The only way in which Kraus could get $4,000 to apply on this payment, instead of merely $2,000, was to have the checks put through the firm. But if it be assumed that the $20,000 loan made by Hannah Sullivan was made to the firm, and was by the firm paid to the City Theaters Company, the individual ownership of the City Theaters Company stock is not changed. Timothy D. Sullivan and Kraus paid to the corporation altogether $65,250. If the $20,000 loan is considered as part payment, there is still a balance left of $45,250, which is not claimed to have come from the firm. Neither is it claimed that any part of that balance appears anywhere in the books of the firm. At the time the $20,000 was paid to the City Theaters Company there was not that much due on the stock already issued. Not only was each member of the firm charged with one-half of this $20,000 as an individual loan, but, as above pointed out, the plaintiffs' own accountant failed to find anything in the books of the firm indicating any interest in or ownership of this stock.

(7) Finally, the learned referee comes to what he calls "a most important piece of evidence bearing upon the entire question, Plaintiff's Exhibit II." This is a statement made by Kraus, for the firm of Sullivan & Kraus, and signed by him, for the purpose of obtaining credit from the Century Bank. The referee says: "This statement was made November 20, 1912, long prior to the time

when Senator Sullivan became ill." "The date therefore becomes important," says the referee, "because it was of a time subsequent to the Carnegie Trust Company transaction, and prior, as aforesaid, to the time of Senator Sullivan's illness, and therefore throws strong light upon what the parties themselves, especially Kraus, must have considered the status of this property." The complete misstatement of fact contained in the above quotation upon what the referee calls "a most important piece of evidence" is sufficient to weaken the entire report. In an earlier part of the report the referee correctly stated: "In the fall of 1912, about August or September, Timothy D. Sullivan became ill, and after that time, as is shown by the record, he took no part in the conduct of the business." Later, as we have seen, the referee declares that this financial statement, made on November 20, 1912, was "long prior to the time when Senator Sullivan became ill." However, the exhibit is important, but not for the reason stated by the referee. When rightly considered, instead of justifying an inference in support of plaintiffs' claim of firm ownership, it tends to overthrow that claim. This statement is supposed to be a statement of the assets of the firm of Sullivan & Kraus. As is usual in financial statements, the assets appear on the left-hand side and the liabilities on the right-hand side. The City Theaters Company's stock does not appear in the list of assets of Sullivan & Kraus, which list includes cash, Circle, Gotham, and Dewey Theaters, and furniture and fixtures. Under the list of assets we have the total of $704,284.28. On the same line at the right-hand side we have the liabilities totaled at $330,205.45. Underneath is the balance, showing assets of the firm over liabilities $374,078.86. Underneath all of these figures a line is drawn across the entire page. Underneath that line the following appears:

"To the above S. & K. own one-half interest in City Theater,
　valued at ............................................... $900,000
"First mortgage............................................ 375,000
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　$525,000

"*Their* equity one-half of the above, $262,500."

Kraus, therefore, in this statement places the interest in the City Theater outside of the assets of the firm of Sullivan & Kraus, merely mentioning that to the bank apparently to show what he and Sullivan owned in addition to the firm property scheduled. It is quite natural for the maker of a financial statement to include everything in a statement that will show his condition in the best possible light. Kraus does not say that he and Sullivan own stock of the City Theaters Company, but that they have an interest in the theater and refers to *their* equity as being one-half, obviously being the individual interests of himself and Sullivan. If the City Theaters Company stock had been firm property, it would naturally have been included in the list of assets on the left-hand side of the statement, just as were included the Circle, Gotham, and Dewey Theaters. Similarly, if the City Theaters Company stock had been considered as part of the firm property, the maker of this statement certainly would not have drawn a balance of assets of the firm over its liabilities, and then placed the City Theater property underneath such balance. The interpretation, therefore, placed by the referee upon this financial statement, is quite as erroneous as his statement that, because it was dated long prior to Sullivan's illness, it threw "strong light" on the intentions of the parties, when the fact was that it was dated months after the time when Senator Sullivan fell ill and ceased to attend to any business. Not only, therefore, have the plaintiffs failed to sustain the burden of proof, but the weight of the evidence decidedly preponderates in favor of the defendants' contention that the stock in question was owned individually by Timothy D. Sullivan and George J. Kraus and should not be accounted for as copartnership property.

The motion to confirm the report is denied, and the report is disapproved and rejected.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

W B. Ellison, of New York City, for appellants.

H. A. Friedman, of New York City, for respondents.

PER CURIAM. Order affirmed, with $10 costs and disbursements, on the opinion of Shearn, J., and matter remitted to referee, to proceed with accounting under interlocutory judgment. Order filed.

SCOTT, J., dissents.

---

WATSON v. CHICAGO, R. I. & P. R. CO.   (No. 7829.)

(Supreme Court, Appellate Division, First Department.   November 12, 1915.)

1. RAILROADS ⊂⊃166—COUPON BONDS—REFERENCE TO TRUST DEED—EFFECT.
   A coupon bond, by declaring it one of a series issued by a railroad company, all equally secured by a certain trust agreement, and referring to said agreement for the right of the bondholders, makes the provisions of the trust deed an essential part .of the contract between the bondholder and his obligor, and the trust deed, bond, ·and coupon must be examined together, to determine the intent and meaning of the contract thereby made.

   [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 516–518; Dec. Dig. ⊂⊃166.]

2. RAILROADS ⊂⊃166—COUPON BONDS—PREMATURE ACTION BY HOLDER—EFFECT OF TRUST DEED.
   A provision in a trust deed, securing railroad bonds, authorizing the trustee to declare the principal due for default in interest, cannot avail the holder of a bond to sue on it before it is by its terms due; the deed denying the holder of a bond right to institute action on or in respect to it, or for any remedy under or on it.

   [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 516–518; Dec. Dig. ⊂⊃166.]

3. RAILROADS ⊂⊃166—COUPON BONDS—ACTION BY HOLDER—EFFECT OF TRUST DEED.
   The provision of a trust deed, securing railroad bonds, that "all remedies conferred by" it "shall be deemed cumulative, and not exclusive," and shall not deprive the trustee of any other remedy, confers no individual right of action on a bondholder.

   [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 516–518; Dec. Dig. ⊂⊃166.]

4. JUDGMENT ⊂⊃691—RES JUDICATA—TRUSTEE AND BENEFICIARY.
   The decree in a suit by the trustee to foreclose a trust deed securing railroad bonds, which is not only a judgment in rem, but in personam, is res judicata as to the bondholders; Code Civ. Proc. § 449, authorizing the trustee of an express trust to sue without joining the beneficiaries.

   [Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1214; Dec. Dig. ⊂⊃691.]

5. JUDGMENT ⊂⊃715—BONDS—ACTION ON COUPON.
   Coupons to a railroad bond in the hands of a bondholder give him no right of action; the trustee under the trust deed having foreclosed for interest as well as principal.

   [Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1244–1246; Dec. Dig. ⊂⊃715.]

---

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes